**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ANTONIO JONES, | : | |
| | : | |
| Plaintiff, | : | Civ. No. 18-1454 (PGS)(DEA) |
| | : | |
| v. | : | |
| | : | |
| NJ DOC CENTRAL | : | **OPINION** |
| TRANSPORTATION, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PETER G. SHERIDAN, U.S.D.J.**

### I. INTRODUCTION

Plaintiff, Antonio Jones ("Plaintiff"), is a state prisoner currently incarcerated at New Jersey State Prison ("NJSP") in Trenton, New Jersey. He is proceeding with a civil rights second amended complaint ("Complaint") against Defendants Abu Ahsan, M.D. ("Ahsan"), Ihuoma Nwachukwu, M.D. ("Nwachukwu"), and Dr. James K. Liu (hereinafter "Medical Defendants"), and New Jersey Department of Corrections ("NJDOC"). (ECF No. 127.) Presently pending before this Court is Medical Defendants' motion for summary judgment (ECF No. 139), Plaintiff's response (ECF No. 144), and Defendants' reply (ECF No. 147). Also pending before this Court is Defendant NJDOC's motion for summary judgment (ECF No. 141), Plaintiff's response (ECF No. 145), Defendant's reply (ECF No. 148), and Plaintiff's

sur-reply (ECF No. 161). The parties have also filed a joint motion to seal. (ECF No. 150.) For the following reasons, the Medical Defendants' motion for summary judgment is granted in part and denied in part and Defendant NJDOC's motion for summary judgment is granted.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On February 6, 2018, Plaintiff filed his initial complaint asserting Eighth Amendment deliberate indifference to the need for medical care claims. (ECF No. 1.) On October 9, 2018, the Court screened Plaintiff's initial complaint for dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B). (ECF No 8.) Upon screening, the Court proceeded Plaintiff's Eighth Amendment denial of medical care and state medical negligence claims against Defendants Liu and Ahsan, and NJSP Medical Department. (*See id.*) The Court dismissed the remaining defendants and claims. (*Id.*) The Court appointed pro bono counsel on December 4, 2018. (ECF No. 14.) Following a motion to dismiss, the Court dismissed Plaintiff's state law claims for failure to comply with the New Jersey Tort Claims Act and dismissed Plaintiff's Eighth Amendment claims regarding his shoulder injury. (*See* ECF Nos. 29, 30.)

On June 10, 2019, Plaintiff filed an amended complaint raising claims against the Medical Defendants, Defendant NJDOC, and Marcus O. Hicks. (*See* ECF No. 33.) On October 28, 2020, the Court granted Defendant Nwachukwu's motion to

dismiss and dismissed the claims against Nwachukwu without prejudice. (ECF Nos. 69, 70.)

On March 17, 2023, Plaintiff filed the operative second amended complaint ("Complaint"), raising claims against the Medical Defendants, Defendant NJDOC, and Marcus O. Hicks.[1] (ECF No. 127.) Plaintiff raised Eighth Amendment deliberate indifference claims against the Medical Defendants and a state law negligence claim against NJDOC. (*See id.*) On June 14, 2023, upon the parties' joint stipulation, the Court dismissed the Complaint against defendant Marcus O. Hicks. (ECF No. 132.)

Plaintiff's Eighth Amendment deliberate indifference claims arise out of the treatment he received for a pituitary tumor. (ECF No. 140-1, Def. State. Of Mat. Facts ("DSOMF") ¶ 1.) By way of background, the NJDOC contracts with Rutgers, the State University of New Jersey ("Rutgers"), to provide medical care for inmates in its custody. (ECF No. 129 ¶ 4.) From July 1, 2014, the date Plaintiff arrived at NJSP, until March 2016, Defendant Ahsan had a medical supervisory role at NJSP and provided care to and oversaw the care of Plaintiff. (DSOMF ¶ 4.) In March 2016, Defendant Nwachukwu took over the role of Medical Director at NJSP, in which

---

[1] Although Count II of the Complaint raises allegations regarding Plaintiff's shoulder injury and the treatment he received for it, Plaintiff acknowledges in the Complaint that the Court dismissed the Plaintiff's shoulder injury claims. (*See* ECF No. 127, fn. 1.) Plaintiff notes that although the Complaint includes allegations relating to his shoulder injury, it does so only to the extent that Plaintiff attempts to preserve his rights on appeal. (*Id.*) Therefore, the motions for summary judgment do not address Plaintiff's allegation as to medical care for his shoulder injuries. (ECF No. 140, fn 1.)

capacity she provided care to and oversaw the care of Plaintiff. (*Id.* ¶¶ 27-28.) Defendant Liu is a neurological surgeon employed by Rutgers and affiliated with University Hospital, who, on occasion, sees patients in NJDOC custody, including Plaintiff. (ECF No. 129 ¶ 8.)

In 2014, while in the custody of Ocean County Jail, Plaintiff was a passenger in an automobile accident. (DSOMF ¶ 2.) Following the accident, Plaintiff underwent a Magnetic Resonance Imagining study ("MRI") that revealed a pituitary tumor. (*Id.*) On March 26, 2014, a repeat MRI, which focused on the pituitary tumor, showed the tumor abutted the optic chiasm, which is part of the optic nerve, but showed it was not putting pressure on the nerve. (*Id.* ¶ 3; ECF No. 140-4 at 35:16-24; ECF No. 140-7 at 86.) Upon Plaintiff's July 1, 2014 arrival at NJSP, Plaintiff underwent a medical intake in which he reported to medical staff that he had a pituitary tumor. (DSOMF ¶ 5.)

On August 13, 2014, Plaintiff attended an ophthalmology consultation with Dr. Hitesh Patel, where it was recommended Plaintiff's visual field be tested and a follow up appointment with neurology was ordered. (*Id.* ¶ 6.) Once a recommendation for an outside specialist or testing are approved, a schedular schedules the appointment or testing with the respective specialist office. (*Id.* ¶ 7.) Ahsan testified that the specialist office sometimes provides the date that is available, but prison policy is to schedule within 60 days of approval, unless the

4

prison medical staff or the specialist deem it an urgent situation, which Plaintiff's situation was not deemed to be urgent. (ECF No. 140-4 at 45:15 to 46:11.)

On October 14, 2014, Plaintiff had a visual field test, which was ordered by Ahsan, but the results were inconclusive. (ECF No. 140-7 at 81-82.) On October 29, 2014, Plaintiff had a consultation with neurosurgeon Dr. Anthony Chiuco of St. Francis Medical Center ("SFMC"). (DSOMF ¶ 8.) Dr. Chiurco referred Plaintiff to a different facility as SFMC was unable to perform any transsphenoidal surgical intervention if a resection of the pituitary tumor was later necessary. (*Id.*)

On November 12, 2014, following Ahsan's approval, Plaintiff saw Dr. Javier Toboada for neurology consultation. (ECF No. 140-7 at 75-76.) Dr. Toboada recommended Plaintiff be referred for a neurosurgical consultation to be evaluated for possible surgery and that Plaintiff be followed by an endocrinology specialist. (*Id.*) In December 2014, following Ahsan's approval, Plaintiff was seen for a consultation with neurosurgeon Defendant Liu. (DSOMF ¶ 10; ECF No. 140-7 at 73; ECF No. 144-12 at 202-203.) Liu noted optic nerve compression, but Plaintiff's visual fields were grossly full. (ECF No. 144-12 at 202-203.) Liu ordered an MRI of Plaintiff's pituitary tumor with stealth to see the extent of the growth and for surgical planning. (*Id.*)

Liu testified in his deposition that a benign tumor of the pituitary gland requires a proper evaluation, workup, and monitoring, or sometimes intervention

depending on the case. (ECF No. 140-6 at 29:11-14.) Several treatment plans exist for patients with a pituitary tumor, which include observation, radiation therapy, surgery, and hormonal treatment depending upon the case. (DSOMF ¶ 12.) If a patient is undergoing an observation treatment plan, the patient receives periodic MRI scans of the tumor usually on a yearly basis. (*Id.*) Liu testified that stealth "is a specific sequence for the MRI that we typically will order in preparing if someone is potentially expected or already expected to have surgery and the stealth protocol allows us to use a technology called neuro navigation during surgery." (ECF No. 140-6 at 47:15-19.) Liu also testified that he was not going to make a surgical recommendation at that time based on out-of-date data. (*Id.* 48:16-23.)

On February 12, 2015, Ahsan ordered the MRI, lab tests, and the follow up consultation that were requested by Liu. (ECF No. 140-7 at 73-74.) On February 25, 2015, Plaintiff had an endocrinology consult with Dr. Merna Soriano, in which it was recommended Plaintiff have a surgical consultation. (DSOMF ¶ 17.) On March 25, 2015, Plaintiff had the ordered MRI. (ECF No. 140-8 at 12-17.)

On April 29, 2015, Liu saw Plaintiff for a follow up and Liu referred Plaintiff to an Ears Nose and Throat ("ENT") specialist, Dr. Eloy, because the surgeries are performed as a team between a neurosurgeon and an ENT. (DSOMF ¶ 18; ECF No. 140-6 at 23:4-5.)

6

During this time, Plaintiff was also attending physical therapy for his left shoulder. (DSOMF ¶ 19.) On May 21, 2015, his treating orthopedist, Dr. Shakir, recommended additional physical therapy. (*Id.*)

On June 3, 2015, Plaintiff saw optometrist Dr. Robert Bucchino with complaints of blurry vision and received prescription eyewear. (ECF No. 140-7 at 67-69.) On August 13, 2015, Plaintiff had a follow up with Dr. Shakir and it was noted that physical therapy was helping, and Plaintiff should continue with it. (ECF No. 140-7.) It was also noted that if Plaintiff's "symptomology persist[ed], certainly over the next 2-3 months, then the only viable [option] would be surgical intervention." (*Id.*) Subsequently, on October 22, 2015, Dr. Shakir recommended surgical intervention. (DSOMF ¶ 21.) Plaintiff understood the risks and benefits of surgery and informed consent was obtained. (*Id.*)

Medical Defendants submit that at the time Dr. Shakir recommended the shoulder surgery, Defendant Liu's evaluation for possible pituitary surgery was an ongoing process, and the pituitary gland was stable, and the most recent MRI showed minimal growth or impact on the optic nerve. (DSOMF ¶ 22.) Defendant Ahsan believed that Plaintiff's shoulder needed to be prioritized. (*Id.*)

Plaintiff submits that when he saw Liu on April 29, 2015, Liu noted that Plaintiff had a "symptomatic pituitary tumor," and he requested physical therapy for Plaintiff's neck pain, lab work, an ophthalmology evaluation, and a consultation with

an ENT regarding possible surgery. (ECF No. 144-1, Pl. State. Of Mat. Facts ("PSOMF") ¶ 22.) Additionally, Liu asked to see Plaintiff in one month, expecting that the requested workup would be complete by then. (*Id.*) Liu testified at his deposition that he was "leaning towards possible surgery, but [he] need[ed] some more completed workup before making the final decision." (ECF No. 144-8 at 78:15-15.)

On November 23, 2015, Plaintiff underwent arthroscopy of his shoulder with Dr. Shakir. (DSOMF ¶ 23.)

On January 5, 2016, Plaintiff saw Dr. Eloy, the ENT specialist that Liu had recommended in April 2015. (ECF No. 144-14 at 49-52.) Dr. Eloy recommended that Plaintiff follow up with Liu. (*Id.* at 52.) On March 9, 2016, Plaintiff saw Liu for a neurological consult, and Liu wished to redo his testing workup. (DSOMF ¶ 25.) Returning from his consultation with Defendant Liu, Plaintiff suffered a new injury to his left shoulder after falling from a transport van and complained of pain. (*Id.* ¶ 26.) Plaintiff had a consult with orthopedist Dr. Shakir the following day. (*Id.*)

On March 2016, Defendant Ahsan left his role as Medical Director at NJSP and was replaced by Defendant Nwachukwu. (*Id.* ¶ 27.) Nwachukwu provided clinical care to inmates in her capacity as a supervising physician, which at times, included providing treatment to Plaintiff. (*Id.* ¶ 28.)

On April 14, 2016, Plaintiff had a follow-up orthopedic consult with Dr. Shakir regarding his injured left shoulder. (ECF No. 140-7 at 55-56.) Dr. Shakir recommended Plaintiff have an MRI of the shoulder. (*Id.*) On May 6, 2016, with Nwachukwu's approval, Plaintiff had the recommended MRI of his pituitary tumor. (ECF No. 140-8 at 3-10.) On May 16, 2016, Nwachukwu arranged for Plaintiff to have the MRI of his left shoulder, which revealed a full thickness tear of his supraspinatus tendon. (ECF No. 140-7 at 53-54.) Plaintiff had a return visit with Dr. Shakir on May 26, 2016. (DSOMF ¶ 31.) At that time, Dr. Shakir was aware that Plaintiff was amid a workup relating to his pituitary tumor but stated that Plaintiff would benefit from shoulder surgery once treatment concluded in relation to his tumor. (*Id.*)

With Dr. Nwachukwu's approval, on June 8, 2016, Plaintiff returned to Defendant Liu. (*Id.* ¶ 32.) Liu's review of the latest MRI found a 2mm growth of the pituitary tumor and made him lean towards surgery. (*Id.*) The surgery was scheduled on August 1, 2016. (*Id.*)

It is customary practice for prisoners to receive the consent form for upcoming surgeries, but they are not notified of the surgery until the morning of, due to safety precautions. (*Id.* ¶ 33.) On July 12, 2016, Plaintiff requested a ninety-day delay in his pituitary tumor surgery as he needed to address his ongoing appeal in relation to his criminal conviction. (ECF No. 140-7 at 49.)

On October 27, 2016, Plaintiff had an orthopedic consultation with Dr. Shakir. (DSOMF ¶ 36.) Dr. Shakir found that Plaintiff had difficulty with his range of motion and activities of daily living and that Plaintiff was ready to proceed with shoulder surgery. (*Id.*) On November 8, 2016, Plaintiff was scheduled for a left shoulder arthroscopic surgery with Dr. Shakir on November 16, 2016. (*Id.* ¶ 37.) On November 14, 2016, Plaintiff's pituitary tumor surgery was rescheduled for December 16, 2016. (*Id.*) On November 16, 2016, Plaintiff underwent left shoulder arthroscopic surgery. (*Id.* ¶ 38.) On December 9, 2016, Plaintiff declined his pituitary tumor surgery that was planned for December 16, 2016, complaining he was still recovering from his shoulder surgery and expected to go back to court in relation to his appeal. (*Id.* ¶ 39; ECF No. 140-7 at 41-42.)

On January 18, 2017, Plaintiff reported that he was agreeable to proceed with the pituitary surgery. (*Id.* ¶ 40.) On February 16, 2017, Defendant Liu requested Plaintiff undergo a repeat MRI and then follow up with Liu before rescheduling surgery. (*Id.* ¶ 41.) On March 24, 2017, Plaintiff had his repeat MRI which found the pituitary tumor remained unchanged in size and unchanged in regard to its effect on the optic chasm. (*Id.* ¶ 42.) Following the request MRI, Plaintiff had a follow up with Liu. (*Id.* ¶ 43.) At that appointment, Plaintiff mentioned chest pain and Liu recommended cardiac clearance as well as pituitary laboratory testing be performed before performing the surgery. (*Id.*)

On April 20, 2017, Plaintiff had a cat scan of his chest that appeared to show calcified plaque in Plaintiff's coronary arteries. (ECF No. 140-7 at 30.) On June 13, 2017, Nwachukwu arranged for Plaintiff to have an initial cardiology consultation with Dr. Destefano and he recommended Plaintiff receive Lipitor as well as undergo a stress test. (DSOMF ¶ 45.) The stress test occurred on August 9, 2017, and demonstrated possible artifact attenuation. (*Id.* ¶ 46.)

On September 13, 2017, Plaintiff met with Dr. Soffer for a cardiology consultation for surgical clearance and it was suggested Plaintiff have an angiogram if it was safe to wait on the pituitary tumor surgery. (*Id.* ¶ 48.) On November 16, 2017, the cardiology consult note and a recent optometry exam note, were sent to Liu and Dr. Eloy for review and consideration of future care. (*Id.* ¶ 49.) On January 10, 2018, Defendant Lui recommended a reevaluation be performed including a new MRI of Plaintiff's pituitary tumor with new laboratory testing. (*Id.* ¶ 50.) Plaintiff received a new MRI on January 16, 2018, and was scheduled a third time for surgery for February 26, 2018. (*Id.* ¶ 51; ECF No. 140-7 at 23-24.)

On February 6, 2018, Plaintiff filed the instant civil suit. On February 14, 2018, Plaintiff informed medical staff that because of this suit, he wanted to proceed with the pituitary tumor surgery with a surgeon other than Defendant Lui. (DSOMF ¶ 53.) On February 21, 2018, Plaintiff had an office visit with Nwachukwu following the decision not to have his scheduled surgery and requested a full cardiac workup

11

before surgery. (*Id.* ¶ 54.) In April 2018, Plaintiff had an endocrinology consultation with Dr. Vinuta Mohan, M.D., where it was recommended Plaintiff have a new MRI, laboratory testing, and visual field testing. (*Id.* ¶ 55.) In May 2018, Nwachukwa arranged for Plaintiff to see Dr. Soffer, who again recommended a coronary angiogram and possible angioplasty. (*Id.* ¶ 56.) In June 2018, Plaintiff underwent a cardiac catheterization, which found no coronary obstruction. (*Id.* ¶ 57.) Dr. Soffer advised there was no cardiac reason to defer the pituitary surgery. (*Id.* ¶ 58.)

Given that Plaintiff commenced this lawsuit against Liu, Defendant Nwachukwu had to find a surgeon outside of the network used for NJSP prisoners. (*Id.* ¶ 59.) Defendant Nwachukwu located Dr. Simon Hanft, from Robert Wood Johnson, to treat Plaintiff's tumor. (*Id.*) On August 29, 2018, Dr. Hanft performed surgery and removed Plaintiff's pituitary tumor. (*Id.* ¶ 60.)

Plaintiff's state law negligence claim against Defendant NJDOC arises from the second injury to Plaintiff's shoulder, which was the result of Plaintiff's fall from a transport van upon the vans arrival back at NJSP following Plaintiff's March 9, 2016 appointment at University Hospital. (*See* ECF No. 142-1, NJDOC State. of Mat. Facts, ¶ 1-7.)

On October 23, 2023, Medical Defendants and Defendant NJDOC filed their motions for summary judgment. (ECF Nos. 139, 141 respectively.) On December 22, 2023, Plaintiff filed his responses to the motions. (ECF Nos. 144, 145

respectively.) On January 22, 2024, Medical Defendants and Defendant NJDOC filed their reply briefs. (ECF Nos. 147, 148 respectively.) On February 28, 2024, Plaintiff filed a sur-reply to Defendant NJDOC's reply brief. (ECF No. 161.)

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *See id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . ., affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts

to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *See Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)). "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). The Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

14

## IV. DISCUSSION

Medical Defendants argue Plaintiff's deliberate indifference to medical care claims should be dismissed. Defendant NJDOC move for summary judgment on Plaintiff's state law negligence claim.

### 1. Deliberate Indifference

Medical Defendants argue that Plaintiff's deliberate indifference to his medical needs claim is negated by the medical records. (ECF No. 221-3 at 10-20.) The Eighth Amendment prohibits the states from inflicting "cruel and unusual punishment" on those convicted of crimes. *Rhodes v. Chapman*, 452 U.S. 337, 344–46 (1981). This proscription against cruel and unusual punishment requires prison officials to provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. *Id.* at 106.

To satisfy the first prong of the *Estelle* inquiry, the inmate must demonstrate his medical needs are serious. Serious medical needs include those that have been diagnosed by a physician as requiring treatment or are so obvious a lay person would recognize the necessity for a doctor's attention, and those conditions which, if

untreated, would result in lifelong handicap or permanent loss. *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

The second element of the *Estelle* test requires an inmate to show prison officials acted with deliberate indifference to his serious medical need. "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994). A plaintiff alleges deliberate indifference "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. *Andrews v. Camden Cty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000). Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment. Implicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotations

and citations omitted). Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. *Estelle*, 429 U.S. at 105–06; *White*, 897 F.2d at 110.

**Defendant Ahsan[2]**

Defendant Ahsan moves for summary judgment on the grounds that Plaintiff cannot establish an Eighth Amendment claim against him because Plaintiff cannot show the required deliberate indifference. Ahsan argues that Plaintiff was provided with consistent medical consults/visits and the prioritization of one medical condition (i.e. Plaintiff's shoulder) over another (i.e. Plaintiff's pituitary tumor) is not a basis for a claim of deliberate indifference. (ECF No. 140 at 11-14.)

As explained at length above, Plaintiff received numerous consultation appointments, diagnostic testing appointments, and follow-up appointments regarding his pituitary tumor. Starting in August 2014, Plaintiff was seen for an ophthalmology consultation, where it was recommended Plaintiff's visual field be tested and that Plaintiff be scheduled for a neurology appointment. (DSOMF ¶ 6.) Defendant Ahsan ordered a visual field test, which took place two months later in

---

[2] Medical Defendants indicate that "for the purposes of this summary judgment motion and in consideration of the case law concerning this prong of the deliberate indifference claim, Medical Defendants understand that an argument can be made that Plaintiff's pituitary tumor did constitute a serious medical condition." (ECF No. 140 at 8.) Therefore, the Court will only address the deliberate indifference prong of *Estelle*.

October 2014, and yielded inconclusive results. (ECF No. 140-7 at 81-82). That same month, Plaintiff had a consultation with a neurosurgeon at SFMC, who noted Plaintiff complained of diminished vision and recommended referring Plaintiff to another facility for any potential surgery. (DSOMF ¶ 8.)

On November 12, 2014, following Defendant Ahsan's approval, Plaintiff saw Dr. Toboada for a neurology consultation and it was recommended Plaintiff be referred for a neurosurgical consultation and an endocrinology specialist. (ECF No. 140-7 at 75-76.) The following month, in December 2014, Plaintiff had his first neurosurgery consultation with Defendant Liu. (DSOMF ¶ 10; ECF No. 140-7 at 73; ECF No. 144-12 at 202-203.) Liu noted optic nerve compression, but Plaintiff's visual fields were grossly full. (ECF No. 144-12 at 202-203.) Liu ordered an MRI of Plaintiff's pituitary tumor with stealth to see the extent of the growth and for surgical planning. (*Id.*)

Liu testified that in December 2014, he was unable to make a surgical recommendation without up-to-date information and that a benign tumor of the pituitary gland requires a proper evaluation, workup, and monitoring, or sometimes intervention depending on the case. (ECF No. 140-6 at 29:11-14; 48:16-23.) Plaintiff argues that Liu wanted the MRI with stealth for surgical planning, thus, as early as December 2014, Liu knew Plaintiff needed surgery to remove his tumor. However, that allegation is not supported by the record. Defendant Liu testified that in

December 2014, he was unable to determine if Plaintiff needed surgery without new imaging and he asked for a stealth MRI "because should the decision be made that he need[ed] surgery the stealth MRI is already in place, and it obviates any unnecessary repeat of an additional MRI." (*Id.* 47:17 to 48:5.) Plaintiff does not submit any facts or evidence to dispute that fact.

While Plaintiff submits that although he reported his pituitary tumor upon his arrival at NJSP in July 2014, he was not seen by neurosurgeon Defendant Lui for five months; however, the Court notes that Plaintiff was seen by an ophthalmologist within one month of his arrival at NJSP, a different neurosurgeon within three months of his arrival, a neurologist within four months of his arrival, and Defendant Liu within two months of the first neurosurgeon indicating that Plaintiff would need to see a different neurosurgeon. Once a recommendation for an outside specialist or testing are approved, a schedular schedules the appointment or testing with the respective specialist office. (*Id.* ¶ 7.) Defendant Ahsan testified that the specialist office sometimes provides the date that is available, but prison policy is to schedule within 60 days of approval, unless the prison medical staff or the specialist deem it an urgent situation, which Plaintiff's situation was not deemed to be urgent. (ECF No. 140-4 at 45:15 to 46:11.) While there were time periods of thirty to ninety days between appointments, the Court does not find these time periods to be such a delay of treatment that would support a finding of deliberate indifference.

In February 2014, Defendant Ahsan spoke with Liu's office and was informed Plaintiff should see Liu on March 11, 2014. (ECF No. 144-12 at 164.) That same month Plaintiff saw endocrinologist, Dr. Soriano, who indicated Plaintiff needed an MRI, a neurosurgery consultation, bloodwork, and Plaintiff should return in a month. (ECF No. 140-7 at 72.) On March 4, 2014, Ahsan made a medical notation that they would await the neurosurgery consult. (ECF No. 144-12 at 163.) Plaintiff received the MRI the following month in March 2014. (ECF No. 140-8 at 12-17.)

The following month, on April 29, 2015, Liu saw Plaintiff for a follow up and Liu referred Plaintiff to an ENT specialist, Dr. Eloy, because the surgeries are performed as a team between a neurosurgeon and an ENT. (DSOMF ¶ 18; ECF No. 140-6 at 23:4-5.) Defendant Liu requested to see Plaintiff back in one month after the labs were complete. (ECF No. 144-12 at 205.) Liu testified that Plaintiff was experiencing blurry vision, nausea, and headaches, so he postulated that he could be symptomatic from the pituitary tumor and therefore, the recommendation was "possible surgery." (ECF No. 140-6 at 74:23 to 75:17.) Liu testified that he needed further testing to confirm the pituitary tumor was causing the symptoms. (*Id.* at 75:18-25.)

The Court finds that until this point the facts do not show Ahsan was deliberately indifferent to Plaintiff's need for treatment. However, from April 2015 until January 5, 2016, when Plaintiff saw ENT Dr. Eloy, which was recommended

by Liu in April 2015, Plaintiff received no treatment or testing for his pituitary tumor. (ECF No. 144-14 at 49-52.) Plaintiff then returned to Liu on March 9, 2016, and at the point Liu required new up-to-date testing. (DSOMF ¶ 25.)

Defendant Ahsan argues that during that nine-month period where Plaintiff received no medical care for his pituitary tumor, Plaintiff was being treated with physical therapy for complaints related to his shoulder. (ECF No. 140 at 12.) Ahsan submits that in May 2015, Dr. Shakir recommended additional physical therapy for his shoulder, but that additional treatment failed and Dr. Shakir believed surgical intervention to be the only remedy. (*Id.*) On November 23, 2015, Plaintiff underwent his left shoulder arthroscopy. (*Id.*) Ahsan argues that Defendant Liu's evaluation for possible pituitary surgery was an ongoing process, and the pituitary gland was stable. Thus, Defendant Ahsan prioritized the care for Plaintiff's shoulder. (*Id.*) Defendant claims that these facts do not rise to a claim for deliberate indifference and Plaintiff has not demonstrated there was any deliberate indifference in treatment of Plaintiff's pituitary tumor for non-medical reason. (*Id.* at 13.) Ahsan submits that Plaintiff received treatment in an approach that was consistent with the medical judgment of Ahsan to address competing medical conditions, one of which (Plaintiff's shoulder) received a surgical recommendation. (*Id.*)

Plaintiff argues that the facts of record conflict with Defendant Ahsan's argument. As noted above in April 2015, Liu found Plaintiff was exhibiting

symptoms that were likely being caused by the pituitary tumor and would likely require surgery. However, Liu required some follow up testing and for Plaintiff to see Dr. Eloy before he could officially recommend surgery. While Plaintiff was experiencing symptoms related to his shoulder, in May and August 2015, Dr. Shakir found physical therapy was helping and Plaintiff should continue with that course of treatment. (DSOMF ¶ 19; ECF No. 140-7 at 66.) It was not until October 2015, six months after Defendant Liu requested follow up testing and noted that Plaintiff's pituitary tumor was symptomatic, that shoulder surgery was recommended. (DSOMF ¶ 21.) Plaintiff did not return to see Liu until almost an entire year later. Defendants offer no facts regarding why Defendant Ahsan failed to send Plaintiff for the testing recommended by the specialist during this time and instead choose to wait months until shoulder surgery was recommended and then proceeded with the shoulder surgery first.

Defendant Ahsan fails to meet his burden of showing there is no genuine issue of material fact. Ahsan argues that Plaintiff presents a disagreement as to the proper medical care which does not amount to deliberate indifference. (ECF No. 140 at 13, citing *White v. Napoleon*, 897 F.2d 103 (3d Cir.1990).) However, Plaintiff presents facts from which a fact-finder could conclude Defendant Ahsan delayed sending Plaintiff to the recommended consultations and diagnostic testing without reason and knowing that Plaintiff's pituitary tumor was symptomatic. A claim that medical

care was delayed or denied completely "must be approached differently than an adequacy of care claim." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 537 (3d Cir. 2017) "Unlike the deliberate indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry—since there is no presumption that the defendant acted properly, it lacks the objective, propriety of medical treatment, prong of an adequacy of care claim." *Id.* "All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id.* Although, Defendant Ahsan argues the delay of treatment decision was made because Plaintiff needed shoulder surgery, he fails to point to any evidence that Plaintiff in fact needed shoulder surgery at the time he decided to delay the testing and return appointment to Defendant Liu. Defendant Ahsan has failed to carry his burden to show there is no dispute of material fact and the motion for summary judgment is denied as to him.

**Defendant Nwachukwu**

Defendant Nwachukwu moves for summary judgment arguing that Plaintiff cannot show deliberate indifference for the delay in his pituitary tumor surgery because the medical record show that Defendant Nwachukwu provide Plaintiff with continued treatment. (ECF No. 140 at 14-18.) Additionally, Defendant Nwachukwu

submits that medical judgments about the priority of treatment are a medical determination and not deliberate indifference. (*Id.* at 18.) Finally, Defendant Nwachukwu argues that there is no evidence that he delayed Plaintiff's surgery for non-medical reasons. (*Id.*)

Defendant Nwachukwu became the Medical Director at NJSP in March 2016. (DSOMF ¶ 27.) Around that time, Plaintiff reinjured his left shoulder (*Id.* ¶ 26), and within a month Plaintiff was seen by Dr. Shakir for an orthopedic consultation (ECF No. 140-7 at 55-56). The following month, May 2016, Nwachukwu sent Plaintiff for an MRI of his shoulder and an MRI of his pituitary tumor. (ECF No. 140-7 at 53-54; 140-8 at 3-10.) On May 26, 2016, Dr. Shakir stated Plaintiff would benefit from shoulder surgery once treatment concluded related to his tumor. (DSOMF ¶ 31.)

Two weeks later, on June 8, 2016, Plaintiff returned to see Defendant Liu and his latest MRI results showed a slight growth of the tumor and Liu recommended surgery. (*Id.* ¶ 32.) The surgery was scheduled for August 1, 2016; however, in July 2016, Plaintiff requested a ninety-day delay in his pituitary surgery while he dealt with the ongoing appeal in relation to his criminal conviction. (ECF No. 140-7 at 49.)

On October 27, 2016, Dr. Shakir found that Plaintiff was ready to proceed with shoulder surgery, which was then scheduled for November 16, 2016. (DSOMF ¶¶ 36-37.) On November 14, 2016, two days before his shoulder surgery, Plaintiff's

pituitary tumor surgery was scheduled for December 9, 2016. (*Id.*) However, on December 9, 2016, Plaintiff again declined to proceed with surgery complaining of post-surgery shoulder pain and that he needed more time in relation to his criminal appeal. (*Id.* ¶ 39; ECF No. 140-7 at 41-42.)

One month later, on January 18, 2017, Plaintiff reported that he was ready to proceed with surgery. (*Id.* ¶ 40.) One month from that date, Plaintiff saw Defendant Liu again, who decided Plaintiff needed a new MRI. (*Id.* ¶ 41.) Plaintiff received the requested MRI approximately four weeks later, on March 24, 2017. (*Id.* ¶ 42.) Following the MRI, Plaintiff returned to Liu, where he reported having chest paint. (*Id.* ¶ 43.) Defendant Liu recommended cardiac clearance before surgery. (*Id.*)

The following month, Plaintiff has a cat scan of his chest which appeared to show calcified plaque in his coronary arteries. Two months later in June 2017, Plaintiff had a cardiology consultation, and a stress test was recommended. (DSOMF ¶ 45.) Plaintiff had the stress test in August 2017, and it showed possible artifact attenuation. (*Id.* ¶ 46.) One month later, Plaintiff had a cardiology consultation, and it was suggested Plaintiff have an angiogram if it was safe to wait on the pituitary tumor surgery. (*Id.* ¶ 48.) On January 10, 2018, Defendant Lui recommended a reevaluation be performed including a new MRI of Plaintiff's pituitary tumor with new laboratory testing. (*Id.* ¶ 50.) Plaintiff received a new MRI a week later and was

scheduled a third time for surgery for February 26, 2018. (*Id.* ¶ 51; ECF No. 140-7 at 23-24.)

However, that surgery had to again be postponed because Plaintiff informed the medical staff that he wanted to proceed with the surgery with a new surgeon because he named Lui in the instant civil action which was filed on February 6, 2018. (*Id.* ¶ 53.) On February 21, 2018, Plaintiff requested Defendant Nwachukwu order a full cardiac workup before surgery. (*Id.* ¶ 54.) Plaintiff than saw endocrinology in April, cardiology in May, and received a cardiac catheterization in June. (*Id.* ¶¶ 55-58.) Defendant Nwachukwu then found a new surgeon, Dr. Simon Hanft, and the surgery was pituitary tumor surgery was performed in August 2018. (*Id.* ¶¶ 59-60.)

Defendant Nwachukwu argues that medical records show that Plaintiff had continued treatment, medical judgments regarding the priority of treatments were made, and nothing in the record indicates that she delayed Plaintiff's surgery for a non-medical reason. Therefore, the record does not demonstrate deliberate indifference on the part of Defendant Nwachukwu.

Plaintiff makes several arguments that Nwachukwu delayed Plaintiff's surgery amounting to deliberate indifference, but those arguments are belied by the record. First, Plaintiff argues that Nwachukwu did not reschedule Plaintiff's surgery after his requested 90-day postponement and then scheduled his second shoulder surgery instead of the pituitary surgery. However, Plaintiff requested a

26

postponement in July 2017 to attend to his criminal conviction appeal and presents no facts to show that he was ready to proceed with the pituitary surgery in ninety days later in October 2017. Rather, Plaintiff again declined the pituitary surgery in December 2017, noting that his appeal was not yet complete and that he was experience post-surgery shoulder pain. The record shows that in December 2017, Plaintiff was still unable to proceed to surgery partially because of his criminal appeal. Plaintiff offers no facts to dispute that fact or to show that Nwachukwu was delaying the surgery.

Plaintiff also argues that Nwachukwu failed to schedule Plaintiff's surgery when he was ready in January 2017. However, the record shows that Nwachukwu sent Plaintiff back to Liu in February 2017 and another MRI was required. After the MRI was done, Plaintiff complained of chest pains and Liu recommended cardiac clearance. Nwachukwu was clearly taking steps towards scheduling Plaintiff's surgery. Plaintiff next argues that Nwachukwu took too long to obtain the cardiac clearance. However, the record shows that Plaintiff had multiple cardiac appointment, which led to the need for more testing and more appointments. Plaintiff then refused to proceed with the February 2018 scheduled surgery because he had sued Defendant Liu.

In cases such as this one, where "a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are

27

generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n. 2 (3d Cir. 1979)). It is a "well-established rule that mere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990); *see also Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (holding that "mere disagreement as to the proper medical treatment" is insufficient to establish an Eighth Amendment violation). Prison medical authorities are "afford[ed] considerable latitude" in the diagnosis and treatment of the medical problems of inmate patients. *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).

The facts regarding the treatment Plaintiff received under the care of Defendant Nwachukwu, as to which the evidence creates no genuine material issue, undermines Plaintiff's deliberate indifference claim against Nwachukwu. As the undisputed notes demonstrate, Plaintiff received consistent medical attention and appointments from various specialists during Defendant Nwachukwu's time as Medical Director. Additionally, Plaintiff chose to delay the surgery on several occasions. This evidentiary record does not support a claim of deliberate indifference by Defendant Nwachukwu.

Notwithstanding this record of regular and consistent medical attention, Plaintiff argues that Defendant Nwachukwu was also deliberately indifferent to Plaintiff's need to see a pain management specialist. Plaintiff points to four notations in the record where a recommendation that Plaintiff see pain management was recorded. (ECF No. 144-12 at 108, 110, 209, 211.) Plaintiff argues that instead of sending Plaintiff to pain management, Defendant Nwachukwu refused to provide Plaintiff with pain medicine and cut his pain medicine. However, the records show only that Defendant Nwachukwu was reducing Plaintiff's pain medication over time. (*Id.* at 6, 30, 47, 60, 70, 90, 119, 121.) Additionally, Defendant Nwachukwu testified that she advised Plaintiff that as he continued "with ortho managing his pain [they] would taper down the narcotics because Tylenol 3 is narcotics" and he did not see a pain specialist because she found it was "not clinically indicated at [that] time." (ECF No. 144-9 at 45:2-3, 46:6-7.) Defendant Nwachukwu testified that Plaintiff's specific conditions were getting the needed treatment and his complaints were subjective, but he was "getting [what] [she] considered clinically to be the right treatment for his clinical condition." (*Id.* at 46:15-19.)

The Court of Appeals for the Third Circuit has recognized that a decision to prescribe nonnarcotic medications, such as Motrin or Tylenol, despite an inmate's request for stronger pain medication is a disagreement concerning treatment and not deliberate indifference. *See Allah v. Thomas*, 679 Fed. Appx. 216, 219 (3d Cir. 2017)

(allegations that medical providers should have prescribed medications stronger than Motrin for inmate's back and leg pain amounted "to 'mere disagreement as to the proper medical treatment' and were thus insufficient to state a plausible constitutional violation"); *see also Wilson v. Jin*, 2016 WL 8345955, at \*16 (W.D. Pa. Nov. 14, 2016) ("plaintiff is not constitutionally entitled to the treatment of his choice and it cannot be assumed that stronger pain medication would have successfully relieved his pain"), report and recommendation adopted, 2017 WL 750484 (W.D. Pa. Feb. 24, 2017), aff'd, 698 Fed. Appx. 667 (3d Cir. 2017). While the Third Circuit has also recognized that refusal to increase the strength of pain medication in the face of repeated complaints of severe, persistent pain may under extreme circumstances constitute deliberate indifference, *see Tenon v. Dreibelbis*, 606 Fed. Appx. 681, 686 (3d Cir. 2015) (per curium), the record in this case falls well short of this threshold.

At best, Plaintiff has demonstrated only his own disagreement with the professional judgment of Defendant Nwachukwu with respect to the appropriate treatment and course of his pain management. Further, "it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) (citing *Youngberg v. Romeo*, 457 U.S. 307, 322–23 (1982)). It is equally well-settled that a plaintiff's mere disagreement with a medical provider's

course of treatment is insufficient to establish a constitutional violation. *White*, 897 F.2d at 110; *Romero v. Ahsan*, No. 13-7695 (FLW), 2018 WL 6696782, at *18 (D.N.J. Dec. 20, 2018) (no constitutional violation where "the evidence before the Court demonstrate[d] that [plaintiff] received extensive and generally prompt medical treatment"); *Battle v. McGann*, No. 17-12041 (RBK), 2018 WL 5263279, at *4 (D.N.J. Oct. 23, 2018) ("In light of Plaintiff's multiple treatments and evaluations, it is apparent that the complaint shows only a [non-actionable] difference in opinion over the course of proper medical treatment rather than a complete denial of medical care.") Under this governing law, Plaintiff has not shown a disputed material issue of fact to show deliberate indifference by Defendant Nwachukwu. Therefore, the Court will grant summary judgment as to Defendant Nwachukwu.

**Defendant Liu**

Defendant Liu moves for summary judgment arguing that the medical records and testimony of the Medical Defendants demonstrate that Liu did not act in any way that rises to the level of deliberate indifference. (ECF No. 140 at 18-20.)

Defendant Liu submits that unlike Defendants Ahsan and Nwachukwu, he is not a doctor at NJSP. Instead, he is an outside specialist and neurosurgeon. The Court laid out in detail above every appointment and medical record relevant to Defendant Liu's appointments with Plaintiff and his recommendations regarding Plaintiff's

treatment. The Court will not recite them here. However, the records show that every time Plaintiff saw Defendant Liu, he ordered the necessary testing to determine if surgery was necessary and in preparation for surgery. Defendant Liu testified that he makes recommendations, but he cannot force a patient to follow that recommendation. (ECF No. 140-6 at 18:17-21.) Additionally, Defendant Liu testified that the patient is responsible for following up and the patient would have to ask the caregiver in charge to make an appointment for him. (*Id.* at 92:24-93:13.) Plaintiff offers no facts to dispute Defendant Liu's testimony that prison staff would be responsible for Plaintiff's scheduling of any recommended appointments. Based upon the foregoing, Defendant Liu has met his burden to show that he is entitled to summary judgment in his favor with respect to Plaintiff's claim that he was deliberately indifferent to Plaintiff's medical needs. Accordingly, the Court will grant the motion for summary as it pertains to Defendant Liu.

### 2. Negligence

Defendant NJDOC move for summary judgment on Plaintiff's state law negligence claim against it, Count III in the Complaint. Among other arguments, Defendant NJDOC argues it is immune in federal court against Plaintiff's state law negligence claim pursuant to the Eleventh Amendment. (ECF No. 142 at 13-14.)

As noted above, Plaintiff's negligence claim pertains to his fall from a prison transport van and the reinjury of his shoulder. Plaintiff acknowledges that the

negligence claim is the only claim raised against NJDOC. (ECF No. 145 at 4.) Additionally, Plaintiff concedes that Defendant NJDOC is entitled to Eleventh Amendment immunity as to his state law negligence claim raised in federal court. (*See id.*) As Plaintiff has conceded that Defendant NJDOC is entitled to Eleventh Amendment immunity, the Court will grant Defendants' motion for summary judgment and dismiss the Complaint against it.

## V. CONCLUSION

For the reasons expressed above, the summary judgement motion of Defendants' Abu Ashan, M.D., Ihuoma Nwachukwu, M.D., and Dr. James K. Liu (ECF No. 139) is granted in part and denied in part. The Court will grant Defendant NJDOC's motion for summary judgment. (ECF No. 141.) The Court will dismiss Plaintiff's Complaint (ECF No. 127) as to Defendants Nwachukwu, Liu, and NJDOC. An appropriate order follows. The parties' joint motion to seal (ECF No. 150) is granted.

DATED: 3/19/24

Peter M Much
PETER G. SHERIDAN
United States District Judge

33